Christopher RICHARDS, Plaintiff,

v.

SEARIVER MARITIME FINANCIAL HOLDINGS, INC., formerly known as Exxon Shipping Co., and Seariver Maritime, Inc., Defendant.

No. CIV. A. H–96–3909.

United States District Court,
S.D. Texas,
Houston Division.

Nov. 12, 1998.

*ORDER*

GILMORE, District Judge.

Pending before the Court is Defendant's Motion for Summary Judgment (Instrument No. 24). Having reviewed the submissions of the parties and the applicable law, the Court finds that the Defendant's motion should be GRANTED.

## I.

Plaintiff Christopher Richards ("Richards"), bring this action against Defendants Seariver Maritime Financial Holdings, Inc., and Seariver Maritime, Inc. ("Seariver" or "Defendant"). Richards alleges violations of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12102(a) and (b), 12112(a) and (b), Title VII of the Civil Rights Act of 1964, the Texas Commission on Human Rights Act ("TCHRA"), TEXAS LABOR CODE ANN. § 21.051 (West 1998), and intentional infliction of emotional distress. Richards seeks actual and exemplary damages, and attorneys' fees and costs. The matter is before the Court on the Defendant's motion for summary judgment.

Richards was employed by Seariver as a temporary maintenance seaman ("MS") on April 2, 1991. Richards was promoted to able-bodied seaman ("AB") on March 1, 1993. Sometime between July and September 1992, Richards injured his elbow while working on a Seariver ship. He was examined by Dr. David A. Smith ("Smith") of Industrial Medical Services ("IMS") in San Francisco. Richards was diagnosed with lateral epicondylitis (tennis elbow) by Dr. Smith, who then administered a cortisone injection to Richards two days later. On April 12, 1993, Richards re-injured his elbow and aggravated his prior injury while "pulling a line during docking operations." (Defendant's Memorandum in Support of Motion for Summary Judgment, Instrument No. 25, at 3) ("Defendant's Memo"). Richards began receiving

short-term disability benefits on April 13, 1993. On August 10, 1993, Richards underwent surgery for his right elbow and began physical therapy sessions. During physical therapy to rehabilitate his elbow, Richards suffered a shoulder injury, a torn rotator cuff. Dr. Gary Gartsman surgically repaired Richards' shoulder on August 17, 1994.

Subsequently, Richards initiated a suit against Exxon Shipping Company, the predecessor to Seariver, in the Southern District of Texas under the Jones Act, 46 U.S.C.App. § 688, to recover worker's compensation disability benefits. In the meantime, Richards' short-term disability benefits expired on April 12, 1994, whereupon Seariver placed Richards on a leave of absence until the litigation was resolved. Richards then applied for and received long-term disability benefits from April 13, 1994, to May 31, 1995.

The court resolved Richards' Jones Act claim for workers compensation when it issued findings of fact and conclusions of law on February 6, 1995. The court found that Dr. Smith had administered an excessive dose of cortisone, thereby exacerbating Richards' elbow injury. The court also determined that Richards was permanently disabled in his right arm, and that he was permanently restricted from lifting more than 25 pounds. Both Seariver and Richards stipulated that Richards was permanently restricted from lifting more than 25 pounds with his right arm and that he could never work as an AB again. During the liability phase of the hearing, on May 4, 1995, the court found that Seariver was liable to Richards for exacerbation of his *elbow* injury, but not the shoulder injury, and assessed damages. However, pursuant to a previously executed "high-low" settlement agreement, Seariver paid Richards $300,000.

Following the trial, Richards attempted to return to work at Seariver. In March 1995, he asked to be assigned to positions of chief mate, second mate, third mate, captain in the foreign flag fleet of Seariver, or MS position. In the alternative, he asked to be assigned to any job that could be accommodated in light of his arm impairment, such as food handler, wiper, maintenance position on a ship, or an onshore position.

In the meantime, Seariver filed suit against IMS and Dr. Smith for his negligence in administering an excessive dose of cortisone to Richards and worsening his elbow injury. During the course of that suit, on March 1, 1996, Richards was deposed by Marco Quazzo, attorney for Seariver. On March 3, 1996, the Seariver Human Resources department committee concluded that Richards did not qualify for any Seariver positions, with or without accommodation, given his medical restrictions and experience. On March 31, 1996, Seariver terminated Richards' employment.

Richards filed a discrimination charge with the EEOC and the Texas Human Rights Commission on June 2, 1995, and an amended charge on May 8, 1996. Richards obtained a "right to sue" letter from the EEOC on August 23, 1996. Richards filed a complaint in this court on November 14, 1996. (Complaint, Instrument No. 1). Plaintiff alleges that Seariver refused to make any reasonable accommodations for his disability under the ADA, and refused to allow him to return to work. (Complaint, Instrument No. 1, at 5). Richards also charges that Seariver discriminated against him on the basis of his race, color, and national origin,[1] alleging that Seariver created a new position for a similarly injured Caucasian worker, but refused to accommodate Richards. (Complaint, Instrument No. 1, at 5). Richards also contends that his termination was in retaliation for filing the Jones Act suit and the EEOC claim. (Complaint, Instrument

1. Plaintiff was a citizen of the West Indies until August 1995. (Defendant's Reply to Plaintiff's Objection to Defendant's Motion for Summary Judgment, Instrument No. 31, at 7).

No. 1, at 6). Finally, Richards alleges that Seariver intentionally inflicted emotional distress upon him through its employees' failure to obtain a new position for Richards at Seariver. (Complaint, Instrument No. 1, at 6).

On March 2, 1998, Defendant moved for summary judgment, arguing that Richards does not qualify for protection under the ADA because he does not have a "disability" as defined by the ADA, that he was not qualified for the jobs he sought, that he cannot prove that he was denied reasonable accommodations or that his disability was a motivating factor in the decision to terminate him. (Defendant's Memo, Instrument No. 25, at 12–17). Seariver argues that Richards' Title VII claims fail because he was not similarly situated in "nearly identical circumstances" as the disabled Caucasian co-worker who was re-employed by Seariver, and that there is no evidence of pretext or intentional discrimination by Seariver (Defendant's Memo, Instrument No. 25, at 2). Regarding the retaliation claim, Seariver contends that there is no proof that Seariver retaliated by discharging Richards because he filed the Jones Act lawsuit and the EEOC claim. Finally, Seariver argues that Richards cannot prevail on his claim of intentional infliction of emotional distress, because his distress does not rise to the requisite level of severity. (Defendant's Memo, Instrument No. 25, at 24–25).

In response, Plaintiff argues that he qualifies as "disabled" under the ADA, the court in his Jones Act suit found that he was permanently disabled in his right arm, and that Seariver stipulated to the same. (Plaintiff's Objection to Defendant's Motion for Summary Judgment, Instrument No. 27, at 7) ("Plaintiff's Objection"). Plaintiff also claims that he was qualified for the alternate positions he sought, and that Seariver refused to accommodate him by adapting a position for him. As to his Title VII claim, Richards contends that as a black West Indian man, he is a member of a protected class, that he was qualified

for alternate positions, and that Seariver replaced him with a Caucasian employee with more severe disabilities. (Plaintiff's Objection, Instrument No. 27, at 10). Finally, Richards argues that he was terminated in retaliation for filing his Jones Act suit and the EEOC claim, and for testifying in an unsatisfactory way against Seariver at the deposition. (Plaintiff's Objection, Instrument No. 27, at 11).

## II.

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Anderson*, 106 S.Ct. at 2510. If the evidence rebutting the motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted. *Anderson*, 106 S.Ct. at 2511; *see Lewis v. Glendel Drilling Co.*, 898 F.2d 1083, 1088 (5th Cir.1990), *cert. denied*, 502 U.S. 857, 112 S.Ct. 171, 116 L.Ed.2d 134 (1991). The summary judgment procedure, therefore, "enables a party 'who believes there is no genuine issue as to a specific fact essential to the other side's case to demand at least one sworn averment of that [specific] fact before the lengthy process of litigation continues.'" *Microsoft Corp. v. CMOS Technologies, Inc.*, 872 F.Supp. 1329, 1334 (D.N.J.1994) (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

Under Rule 56(c), the moving party bears the initial burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial, and for identifying those portions of the record that demonstrate such absence.

*Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Leonard v. Dixie Well Serv. & Supply, Inc.*, 828 F.2d 291, 294 (5th Cir.1987).

Where the moving party has met its Rule 56(c) burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (quoting FED. R. CIV. P. 56(e)) (emphasis in original); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Leonard*, 828 F.2d at 294. To sustain the burden, the nonmoving party must produce evidence admissible at trial. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2514; *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir.1992) ("To avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue...."). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonable find for the plaintiff." *Anderson*, 106 S.Ct. at 2512.

"A plaintiff may use either direct or circumstantial evidence to prove a case of intentional discrimination." *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 328 (5th Cir.1994). Because direct evidence is rare, summary judgment evidence in discriminatory treatment cases under the ADA and Title VII is examined under the three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 162 (5th Cir.1996) (applying the *McDonnell Douglas* burden-shifting approach in ADA cases); *Leckelt v. Board of Comm'rs of Hosp. Dist. No. 1*, 909 F.2d 820, 825 n. 11 (5th Cir.1990) (same); *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir.

1994) ("There are two methods of establishing a prima facie case of disparate treatment under Title VII: direct or indirect (inferential)"); *Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir.1985) ("[A] plaintiff may establish a prima facie case of disparate treatment [under Title VII either] by satisfying the *McDonnell Douglas* four-part test, thereby creating a rebuttable presumption of discriminatory treatment, or by presenting *actual evidence, direct* or circumstantial, of the employer's discriminatory motive") (emphasis added). First, a plaintiff must establish a prima facie case of alleged wrong-doing by a preponderance of the evidence. *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 507 (5th Cir.1994). If that requirement is met and a prima facie case is established, the burden then shifts to the defendant to articulate legitimate, non-discriminatory reasons for the discharge. *Id.* To meet that burden, the defendant must clearly set forth through admissible evidence reasons that would support a finding that unlawful discrimination was not the basis for the employment action. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). After the defendant has provided legitimate, non-discriminatory reasons for its action, the burden shifts back to the plaintiff to demonstrate that the defendant's articulated reasons are mere pretexts for discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981). The plaintiff satisfies this requirement by showing, through a preponderance of evidence "that the employer's reasons were not the true reason for the employment decision and that unlawful discrimination was." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir.1993).

■ When "direct credible evidence of employer discrimination exists, a different process appertains." *Vaughn v. Edel*, 918 F.2d 517, 521 (5th Cir.1990) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523

(1985) ("the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination.")). "Direct evidence of discrimination is evidence, which, if believed, would prove the existence of a fact (i.e. unlawful discrimination) without any inferences or presumptions." *Nichols v. Loral Vought Systems Corp.*, 81 F.3d 38, 40–41 (5th Cir.1996) (quoting *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 958 (5th Cir.1993)). Direct evidence of employer discrimination includes a "statement or written document showing [the employer's] discriminatory motive on its face[.]" *Vaughn*, 918 F.2d at 521. "A plaintiff who can offer *sufficient direct evidence* of intentional discrimination should prevail [on summary judgment], just as in any other civil rights case where a plaintiff meets his burden." *Nichols*, 81 F.3d at 40 (emphasis added); *see* 42 U.S.C. § 2000e-2(m) (stating that an unlawful employment practice is established when complainant demonstrates that race or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice); LEX K. LARSON, EMPLOYMENT DISCRIMINATION § 8.07 (2d ed.1996) (stating that when plaintiff presents direct evidence of discrimination employer can no longer avoid liability by proving that the same decision would have been made absent the discrimination).

Thus, a plaintiff can avoid summary judgment if "the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that [plaintiff's protected status] was a determinative factor in the actions of which the plaintiff complains." *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 994 (5th Cir.1996). Triable issues, however, will only be found if there is a conflict in substantial evidence. *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 449 (5th Cir.1996). In the employment discrimination context, "evidence is substantial if it is 'such as to allow a rational factfinder to make a reasonable inference that [the employee's disability]

was a determinative reason for the employment decision.'" *LaPierre*, 86 F.3d at 449 (*quoting Rhodes*, 75 F.3d at 993). Employing the burden-shifting approach, however, does not relieve plaintiff of her ultimate burden of proving intentional discrimination. *St. Mary's*, 113 S.Ct. at 2747–48.

### III.

### A.

Richards claims he has produced direct evidence of discrimination on the part of Seariver. "Direct evidence of discrimination is evidence, which, if believed, would prove the existence of a fact (i.e. unlawful discrimination) without any inferences or presumptions." *Nichols v. Loral Vought Systems Corp.*, 81 F.3d 38, 40–41 (5th Cir. 1996) (quoting *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 958 (5th Cir.1993)). Direct evidence of employer discrimination includes a "statement or written document showing [the employer's] discriminatory motive on its face[.]" *Vaughn*, 918 F.2d at 521. In *Rizzo v. Children's World Learning Ctr., Inc.*, ("CWLC"), the Fifth Circuit found that the plaintiff presented direct evidence of discrimination based on disability and denied summary judgment. 84 F.3d 758 (5th Cir.1996). There, Rizzo, who was hearing impaired, served as a classroom assistant, did administrative paperwork, and drove the children in the company bus. *Id.* at 760. When she informed CWLC that her hearing impairment had worsened, the employer removed Rizzo from her bus driving duties. *Id.* CWLC states that it removed Rizzo from driving because she might not hear a choking child on the bus. *Id.* at 761. The court found that hearing a choking child was not an essential duty of driving the bus. The court held her suspension from driving constituted direct evidence of discrimination because CWLC admitted it removed Rizzo from her driving duties due to her hearing impairment. *Id.* Consequently, the standard for direct evidence

demands that the alleged discriminatory motive be clear on its face. *Id.; see Vaughn,* 918 F.2d at 521.

■ Here, as direct evidence of Seariver's discrimination on the basis of his impairment, Richards offers an email written by Joan Gerosa; a statement by Sonia Townsend that Seariver denied Richards' personal injury claims; the failure of Ron Floyd, his supervisor aboard ship, to inquire as to shoreside or onshore positions; and a remark by Marco Quazzo at Richards' deposition in a suit by Seariver against IMS and Dr. Smith. (Plaintiff's Objection, Instrument No. 27, at 2–4). Richards first refers to an email from Joan Gerosa ("Gerosa"), benefits specialist at Exxon, to Terry Thompson ("Thompson") at Seariver, dated October 24, 1997, which states that "if the plan is to terminate [Richards'] employment, we would suggest that be done at the completion of his extended LOA [leave of absence]." (Plaintiff's Objection, Instrument No. 27, Exh. C, Deposition of Joan Gerosa, Exh. 1). Richards argues that the email shows Seariver planned to terminate him long before it actually took action, thus proving that Seariver never intended to accommodate Richards or find other employment for him at Seariver. (Plaintiff's Objection, Instrument No. 27, at 9). While it may be inferred that Seariver planned to terminate Richards in advance of March 31, 1996, the proffered evidence fails to show Seariver's "discriminatory motive *on its face." See Vaughn,* 918 F.2d at 521 (emphasis added). The email fails to state that Seariver planned to terminate Richards because of his disability. Thus, the email does not constitute direct evidence.

■ Next, Richards claims that Sonia Townsend ("Townsend"), case manager for the medical director at Seariver, testified that Seariver "denied Richards' personal injury and medical claims." (Plaintiff's Objection, Instrument No. 27, at 2). Townsend's testimony reveals that Seariver did not provide medical authorization for Richards' physical therapy for his shoulder, because it did not believe his shoulder injury occurred on the job. (Plaintiff's Objection, Instrument No. 27, Exh. D, Deposition of Sonia Townsend, at 48). Again, while the refusal to provide authorization may show that Seariver knew of Richards' impairment, it does not prove *on its face* that his injury was the motive for his discharge.

■ Richards also argues that his direct supervisor aboard ship, Ron Floyd ("Floyd"), "testified he did not nor was he aware of any inquiry as to shoreside or offshore positions available for Plaintiff." (Plaintiff's Objection, Instrument No. 27, at 3). Floyd did in fact state at his deposition that he did not know if any shoreside positions were available; however, Floyd goes on to explain this was because it was not part of his job duties. (Plaintiff's Objection, Instrument No. 27, Exh. E, Deposition of Ronald Floyd, at 176). Floyd states he was only responsible for "fleet employment," not shoreside employment. (*Id.*). Moreover, Floyd's statement does not evince *on its face* a failure to take action because Richards was impaired. Thus, this statement fails to constitute direct evidence.

■ Finally, Richards claims that Seariver's discriminatory motive for his discharge was made clear on its face while he was being deposed for Seariver's case against IMS and Dr. Smith. Seariver brought suit against IMS and Smith for exacerbating Richards' elbow injury by administering an excessive amount of cortisone. Richards was deposed by Seariver on March 1, 1996, by Marco Quazzo of McCutchen Doyle Enerson & Brown, who was representing Seariver. Richards claims that during the deposition, Quazzo "became frustrated and unhappy with Chris Richards' testimony...Quazzo then said to [Richards' attorney] that after Chris Richards' testimony he was never going to get his job back and specifically said, 'They're never going to put him back to work.'" (Plaintiff's Objection, Instru-

ment No. 27, at 3). Richards was terminated one month later, on March 31, 1996. Quazzo denies ever having made this remark. (Defendant's Memo, Instrument No. 25, Affidavit of Marco Quazzo, at 2). Thus there is a genuine issue as to whether this statement was ever made. Even assuming the statement was made, however, like the others it fails to demonstrate any facially discriminatory motive on the part of Seariver. Quazzo did not say Richards would never get his job back because he was disabled. In fact, Richards claims he was discharged in part because his testimony was unsatisfactory and Quazzo became frustrated. At most Quazzo's statement presents circumstantial evidence, and therefore, Richards must present a prima facie case of discrimination under the ADA.

**B.**

Section 12112(a) of the ADA prohibits discrimination in employment against persons with disabilities, providing that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Essential functions include those "fundamental" duties to be performed in the position in question, but not

functions that are merely "marginal." 29 C.F.R. 1630.2(n)(1). In addition, an employer must make reasonable accommodations for the known disabilities of an otherwise qualified person unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business. 42 U.S.C. § 12112(b)(5)(A). The failure to provide such accommodations is another form of prohibited discrimination under the ADA. 42 U.S.C. § 12112(b)(5)(A).

In order to succeed on a claim under the ADA, the plaintiff must prove by a preponderance of the evidence that (1) he suffers from a disability; (2) he was otherwise qualified for the job; (3) he was subject to an adverse employment action; and (4) he was treated less favorably than non-disabled employees. *Daigle v. Liberty Life Ins. Co.,* 70 F.3d 394, 396 (5th Cir. 1995).

**1.**

Richards first argues that his impairment is a "disability" as defined by the ADA because his arm impairment substantially limits his major life activities, not including working. Seariver, in turn, argues that Richards does not have an impairment that substantially limits a major life activity.[2] A disability under the ADA is "a physical or mental impairment that substantially limits one or more of the major life activities of the individual." 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g). The regulations define "major life activities" to "mean[ ] functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breath-

**2.** Richards appears to misunderstand Seariver's assertion that he is not "disabled" under the ADA. Richards argues that during the Jones Act suit, Seariver and Richards stipulated that Richards was "permanently disabled from returning to work as an able-bodied seaman and cannot lift more than 25 pounds with his right arm," and argues Seariver cannot now claim that he is not disabled. (Plaintiff's Objection, Instrument No. 27, Exh. A, Findings of Fact and Conclusions of Law, at 17, ¶ 4). However, the fact that the court

found that Richards is permanently disabled from working as an Able Seaman does not have the same legal significance as a finding that Richards is "disabled" under the ADA. The ADA requires a higher standard of proof in determining whether or not a plaintiff is disabled. Seariver may have stipulated that Richards is permanently disabled in his right arm, but that does not amount to a concession that Richards is "disabled" within the meaning of the ADA. *See* accompanying text.

ing, learning, and working." 29 C.F.R. § 1630.2(i). A person is "substantially limited" in the performance of such activities if he is "restricted as to the conditions, manner, or duration under which [these major life activities] can be performed in comparison to most people." 29 C.F.R. Pt... 36, App. B § 36.104. Whether an impairment "substantially limits" a "major life activity" is determined by considering: "1) the nature and severity of the impairment; 2) its duration or expected duration; and 3) its permanent or expected permanent or long-term impact." 29 C.F.R. § 1630, App., § 1630.2(j).

██ Richards is permanently restricted from lifting more than 25 pounds with his right arm, and is not to engage in overuse or repetitive action with his right arm. (Plaintiff's Objection, Instrument No. 27, Exh. B, Deposition of Christopher Richards, Exh. 7, Richards Letter to Floyd, at 1). Seariver argues that a 25–pound lifting restriction is not a substantial limit on major life activities. (Defendant's Memo, Instrument No. 25, at 13)(citing *Ray v. Glidden Co.*, 85 F.3d 227, 229 (5th Cir. 1996)). In *Ray*, the plaintiff, a lift truck operator, was diagnosed with a vascular necrosis and underwent hip and shoulder replacement surgery. 85 F.3d at 228. Ray was subject to lifting restrictions, including lifting forty-four to fifty-six-pound containers for one to three and one-half hours per day. *Id.* at 229. The Court found that since Ray could still lift and reach as long as he did not engage in heavy lifting, he was not substantially impaired under the ADA. *Id.* at 227.

██ To determine whether a person is substantially limited in major life activities other than working, "the court looks to whether that person can perform the normal activities of daily living." *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1120 (5th Cir.1998). Here, Richards has not presented evidence that he is unable to perform functions such as caring for himself, performing manual tasks, walking, seeing, hearing, speaking, breathing, and

learning. In fact, Richards testified in February 1998 that his injury has not affected those abilities. (Plaintiff's Objection, Instrument No. 27, Exh. B, Deposition of Christopher Richards, at 104). Richards has not testified that he is unable to feed himself, groom himself, or carry groceries. *See Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir.1995) (listing examples of "normal activities of daily living"). Like Ray, Richards is still able to engage in lifting and reaching under 25 pounds with his right arm, and unlimited lifting with his left arm. A "restriction on heavy lifting... alone is insufficient for a reasonable jury to find a substantial limitation on a major life activity." *Sherrod*, 132 F.3d at 1120 (plaintiff with neck injury had a lifting restriction of 45 pounds occasionally and 20 pounds frequently). Therefore, under the ADA, Richards does not have a physical impairment that substantially limits a major life activity other than working. Richards also argues that his arm impairment substantially limits his major life activity of working. In regard to the major life activity of working, "[s]ubstantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. The inability to perform a single, particular job does not constitute a substantial limitation on the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(1); *Sherrod*, 132 F.3d at 1120. The plaintiff claiming disability must present evidence of the number and type of jobs from which he is disqualified or that he is limited to jobs which do not require heavy lifting. *See Sherrod*, 132 F.3d at 1120. By arguing that he is "disabled" under the ADA, Richards asserts that he is unable to perform either a class of jobs or broad range of jobs in various classes as a seaman. Nevertheless, Richards requested that Seariver attempt to place him in positions that required heavy lifting, such as chief mate, second mate,

third mate, and maintenance seaman. Moreover, he stated in February 1998 that his grip strength was "fine," that he could climb ladders effectively, climb vertical ladders, and climb Jacobs ladders "if I have to... if I must." (Plaintiff's Objection, Instrument No. 27, Exh. B, Deposition of Christopher Richards, at 88). Richards has not produced evidence to show that he is disqualified from more than a single job, that of Able Seaman; instead, he claims he is able to perform functions of other jobs if required. Even if Richards was unable to climb ladders, "the inability to perform one aspect of a job while retaining the ability to perform the work in general does not amount to a substantial limitation of the activity of working." *Dutcher*, 53 F.3d at 727. Consequently, Richards' contradictory claims and lack of evidence to support his claims result in failure to show a substantial limitation on the major life activity of working.

■ In the alternative, Richards argues that Seariver perceived him as having an impairment that substantially limited a major life activity, whether he actually had such an impairment or not. The facts provided by both parties show that Seariver did not return Richards to his position as an Able Seaman; that after his initial elbow injury in 1992, Richards was placed on light duty, and took six months of leave; and was then terminated in 1996. Both parties stipulated in the Jones Act suit that Richards was permanently disabled in his right arm with a lifting restriction. (Plaintiff's Objection, Instrument No. 27, Exh. A, Findings of Fact and Conclusions of Law, at 17 ¶ 4). The report of the Seariver Human Resources committee stated it felt Richards would be unable to perform other jobs or fill shoreside positions due to his medical restrictions. However, this does not constitute evidence that Seariver regarded Richards as being "disabled" within the meaning of the ADA: that is, that Richards was substantially limited in his ability to perform a major life function. Therefore, Richards cannot support his claim that Seariver regarded him as being disabled, and fails to establish the first element of his prima facie case.

2.

Assuming that Richards could prove he is disabled within the meaning of the ADA, he must still meet the second element of the prima facie case. A disabled individual may be otherwise qualified for a particular position if, despite the disability, he can still perform the essential functions of the job with or without reasonable accommodations. 42 U.S.C. § 12111(8); *Chandler v. City of Dallas*, 2 F.3d 1385, 1393–94 (5th Cir.1993). The essential functions of a position include the basic, fundamental duties of the job; the marginal duties associated with the position are not taken into account in determining a disabled employee's qualifications. 29 C.F.R. § 1630.2(n); *see also Chiari v. City of League City*, 920 F.2d 311, 315–18 (5th Cir.1991). The employee has the burden of proving that he can perform all the essential elements of his job, with or without accommodation. *Rizzo*, 84 F.3d at 763.

■ Richards offers his testimony as evidence to refute the assertions that he is physically incapable of performing the essential elements of the chief mate, second mate, and third mate positions. According to Floyd, the essential functions of the positions include loading and discharging cargo, deck maintenance, cleaning tanks, mooring and unmooring vessels, and lifting heavy wires. (Plaintiff's Objection, Instrument No. 27, Exh. E, Deposition of Ronald Floyd, at 121–140). Floyd testified that all three positions involve a significant amount of lifting, climbing the ladders on the ship, pulling, and pushing. (*Id.*). Richards stated in February 1998 that he would climb ladders "if [he] ha[d] to," and that his grip strength was "fine." (Plaintiff's Objection, Instrument No. 27, Exh. B, Deposition Christopher Richards, at 88). Moreover, Richards has not shown

the accommodations he would require to carry out his job despite his impairment.

Seariver presented summary judgment evidence to argue that Richards is not a qualified individual with a disability, because he could not perform the essential elements of his job as an Able Seaman, with or without accommodation. Seariver argues that Richards' permanent lifting restriction on his right arm prevents him from performing essential elements of the positions of master, chief mate, second mate, and third mate. (Defendant's Memo, Instrument No. 25, at 9–10; *see* Defendant's Memo, Instrument No. 25, Exh. E, Deposition of Ronald Floyd, at 121–140). Floyd stated that he did not believe Richards would be able to perform the essential duties with his arm restrictions. (*Id.*). Moreover, Floyd noted that Richards would have been restricted from holding those positions in any case, because Richards did not have U.S. Coast Guard license, which is required. (*Id.* at 123).

 Furthermore, Seariver argues that as both parties stipulated in the Jones Act suit that due to his impairment, Richards cannot ever be an Able Seaman, he cannot now claim he is qualified to perform the essential duties of an Able Seaman. (Defendant's Memo, Instrument No. 25, at 14).[3]

3. The doctrine of judicial estoppel "applies where a party tries to contradict in a second lawsuit his sworn statement in previous litigation. It is intended to protect the integrity of the judicial process, avoid inconsistent results, and prevent litigants from playing fast and loose in order to secure an advantage." *Grant v. Lone Star Co.*, 21 F.3d 649, 651 n. 2 (5th Cir.1994), *citing United States ex rel. Am. Bank v. C.I.T. Constr.*, 944 F.2d 253, 258–59 (5th Cir.1991); *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir.1988). Although the doctrine has not been adopted uniformly by the federal courts, this Court's use of the doctrine is a matter of judicial discretion. *Nichols v. Scott*, 69 F.3d 1255, 1272 & n. 33 (5th Cir.1995), *cert. denied sub nom. Nichols v. Johnson*, 518 U.S. 1022, 116 S.Ct. 2559, 135 L.Ed.2d 1076 (1996).

Recent cases from this circuit have declined to apply estoppel theory, opting instead to view such statements as a factor in the overall analysis of whether a plaintiff is a qualified individual within the meaning of the ADA. *Morton v. GTE North Inc.*, 922 F.Supp. 1169, 1183 (N.D.Tex.1996); *Pegues v. Emerson Electric Co.*, 913 F.Supp. 976, 981 (N.D.Miss. 1996).

However, district court cases from various circuits have found that prior statements of total or permanent disability barred a claim for discrimination under the ADA. *McNemar v. Disney Stores, Inc.*, No. 94–6997, 1995 WL 390051 (E.D.Pa. June 30, 1995); *Garcia–Paz v. Swift Textiles, Inc.*, 873 F.Supp. 547, 554 (D.Kan.1995); *Kennedy v. Applause, Inc.*, No. 94–5344, 1994 WL 740765 (C.D.Cal. Dec. 6, 1994); *Reigel v. Kaiser Foundation Health Plan of N.C.*, 859 F.Supp. 963 (E.D.N.C.1994); *see also McNeill v. Atchison, Topeka & Santa Fe Ry.*, 878 F.Supp. 986 (S.D.Tex.1995).

In *McNemar v. Disney Stores, Inc.*, 1995 WL 390051 at *3, for example, the court determined that "an employee who represents on a benefits application that he is disabled is judicially estopped from arguing that he is qualified to perform the duties of the position involved." The *McNemar* court entered summary judgment on an ADA disability claim against an employee with AIDS who had received Social Security benefits after representing that he was totally and permanently disabled from doing work. Finding that the plaintiff could not be simultaneously "unable to do work" for purposes of the administrative determination and "qualified to perform the duties of his position" for purposes of the ADA claim, the district court noted that

"Plaintiff in the case sub judice cannot speak out of both sides of [his] mouth with equal vigor and credibility before this court. Plaintiff now seeks money damages from [his employer] on [his] assertion that [he] was physically willing and able to work during the same period that [he] was regularly collecting disability payments on [his] assertion that [he] was physically unable to work."

*McNemar*, 1995 WL 390051 at *4 (quoting *Reigel v. Kaiser Foundation Health Plan of N.C.*, 859 F.Supp. 963, 970 (E.D.N.C.1994)).

The district court in *McNemar* stated:

[f]irst, while this Court recognizes the apparent unfairness of forcing individuals to choose between seeking disability benefits and suing under the ADA, there is no indication that either the United States Congress or the New Jersey legislature intended to provide disability benefits to persons capable of obtaining gainful employment, and it is province of the legislature rather than this Court to authorize such double recovery. Second, since a disabled person who

Even if an employee is "disabled" under the ADA, the employee must show that the employer failed to reasonably accommodate his disability. "Reasonable accommodations" means "modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(*o*)(1)(ii). It is the plaintiff's "initial request for accommodation which triggers the employer's obligation to participate in the interactive process of determining" a reasonable accommodation. *Taylor v. Principal Financial Group*, 93 F.3d 155, 165 (5th Cir. 1996); 29 C.F.R. § 1630.9. An employer's duty to provide reasonable accommodation may include but does not require "job restructuring; part-time or modified work schedules; reassignment to a vacant position," or transfer to an occupied position. 29 C.F.R. § 1630.2(*o*)(2); *see also Daugherty v. City of El Paso*, 56 F.3d 695, 698 (5th Cir.1995) (quoting *Chiari*, 920 F.2d at 317). Furthermore, an employer is not required under the ADA to always provide the employee with the best possible accommodations or in the specific manner the employee requested. 29 C.F.R. § 1630.9. An employer is not required to endure undue hardship, which is "a significant difficulty or expense incurred by a covered entity." 29 C.F.R. § 1630.2(p)(1). The employer has broad discretion in determining which alternative accommodation should be provided. 29 C.F.R. § 1630.9.

Richards argues that Seariver intended to terminate his employment as early as October 1994, and never intended to seek reasonable accommodations for his impairment. (Plaintiff's Objection, Instrument No. 27, at 9). He offers Gerosa's email to Thompson as proof that Seariver planned to discharge him without regard to his abilities. Seariver counters by pointing to Gerosa's testimony, which states it was Exxon policy to terminate an employee of less than five years who had exhausted both three-month leave periods. (Plaintiff's Objection, Instrument No. 27, Exh. C, Deposition of Joan Gerosa, at 10).

Richards initiated the accommodation process when he wrote to Floyd requesting to return to work, and claimed that in the absence of seafaring positions, he was willing to work as a food handler, wiper, maintenance seaman, be responsible for the first aid kit, steer the wheel in emergency situations, or take an onshore position. (Plaintiff's Objection, Instrument No. 27, at 8). This action triggered Seariver's duty to "participate in the *interactive process* of determining" a reasonable accommodation. *Taylor*, 93 F.3d at 165 (emphasis added). There is no evidence that Seariver consulted with Richards in "an interactive process" to find a suitable position for him after his request. Richards claims that he never received a response to his request before his termination. (Plaintiff's Objection, Instrument No. 27, at 8). Seariver in turn alleges that its Human Resources committee fully considered available positions both on ship and onshore, and concluded that in light of Richards' medical condition, education, and experience, there were no positions available. (Defendant's Memo, Instrument No. 25, at 16). Seariver claims there were three onshore positions available from the time Richards requested accommodation, in March 1995, until he was discharged in March 1996: ship group coordinator, which was filled when Seariver promoted one of its captains; marine advisor, executive assistant to the Seariver president; and computer systems analyst. (Defendant's Reply, Instrument No. 31, at 8). Seariver argues that Richards never of-

---

believes he has been the victim of discrimination retains the option of filing suit pursuant to the ADA, this Court fails to understand how the ADA's goals would be thwarted by rejecting the principle of judicial estoppel in this case.

*McNemar*, 1995 WL 390051 at *4.

fered proof that he had the requisite education and training for these positions. (Defendant's Reply, Instrument No. 31, at 8). However, Seariver does not present any evidence that it even consulted with Richards to determine whether he had the qualifications. The failure to respond at all to Richards' request evinces the absence of an interactive process where both parties made suggestions and negotiated a reasonable accommodation. Thus, although Richards has shown that Seariver failed to reasonably accommodate his impairment, he has not proven that he was otherwise qualified to perform the various positions he sought. Accordingly, he fails to establish the second element of the prima facie case.

### 3.

"To constitute a cognizable 'adverse employment action' an action must be an ultimate employment decision." *Skinner v. Brown*, 951 F.Supp. 1307, 1315 n. 9 (1996), *aff'd*, 134 F.3d 368 (5th Cir.1997) (citing *Dollis v. Rubin*, 77 F.3d 777, 781 (5th Cir.1995)). "'Ultimate employment decisions' include acts 'such as hiring, granting leave, discharging, promoting, and compensating.'" *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (quoting *Dollis*, 77 F.3d at 781–82 (noting that Title VII was not designed to "address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions")). The plaintiff must show that the defendant employer took the adverse employment action *solely* because of the employee's disability. *Rizzo*, 84 F.3d at 764 (emphasis added); *see Washington v. HCA Health Serv. of Texas, Inc.*, 152 F.3d 464, 467 (5th Cir.1998). Specifically, Richards argues that Seariver did not respond to Richards' request to be returned to work in any position with accommodation, refused to consider accommodation, and ultimately terminated his employment. (Plaintiff's Objection, Instrument No. 27, at 8). Richards claims he would have returned to work either as mate or master, or any position where his impairment could be accommodated. (Plaintiff's Objection, Instrument No. 27, Exh. B, Deposition of Christopher Richards, Exh. 7).

Richards has not produced competent summary judgment evidence to show Seariver discharged him solely because of his disability. Seariver argues that it considered accommodations for the various positions Richards requested, but concluded that in light of his lifting restriction, his training, and education, that first, he would not be able to safely serve on board a ship, and second, that no shoreside positions were available to him. (Defendant's Memo, Instrument No. 25, at 16). Seariver argues that at the Jones Act trial, Richards himself testified that he would be unable to take necessary action in case of an emergency, such as lifting lifeboats and life rafts, that he would have problems turning and opening an emergency hatch, and that he could not don his survival suit in case he had to abandon ship because "putting it on requires extensive pulling and tugging with his right arm." (Defendant's Memo, Instrument No. 25, at 8). The court found that "if Richards worked at sea, he would present a danger to himself and others in times of emergency." (Defendant's Memo, Instrument No. 25, Exh. 2. at 4, ¶ 12). In addition, Seariver argues that given Richards' lifting restriction and his weak grip, he would be unable to climb ladders, turning valves, handling mooring lines, etc., all of which are essential to the jobs Richards requested. (Defendant's Memo, Instrument No. 25, at 9–10). With regard to shoreside positions, Seariver argues that there was no vacant position that he could fill "given his medical restrictions, education, training and experience." (Defendant's Memo, Instrument No. 25, at 16). Even viewed in the light most favorable to Richards, the evidence does not show that Seariver discharged him solely because of his disability.

### 4.

Richards argues that the failure to treat him like similarly situated non-dis-

abled employees evinces Seariver's intent to discriminate against him on account of his disability. Richards claims that Seariver decided to terminate his employment when he became impaired, and had no intention of reasonably accommodating his disability. (Plaintiff's Objection, Instrument No. 27, at 9). Richards bases his claim on an email sent by Gerosa, allegedly with "the acknowledgment that Plaintiff was to be terminated regardless of his abilities or of what positions were available to him." (Plaintiff's Objection, Instrument No. 27, at 9).

In order to prevail in a prima facie case, the plaintiff must show "that, after his rejection, the position remained open and the employer continued to seek applicants from persons of the [plaintiff's] qualifications." *McDonnell Douglas*, 93 S.Ct. at 1824. Richards argues that after his discharge, he was replaced by a non-disabled individual. Richards does not provide specific factual evidence to support his allegation; instead, he alludes to the fact that Seariver created a position for Jay Nichols, a white employee who was also injured on board a ship, while Seariver did not create a position for Richards. Even assuming Richards is referring to the creation of a position for Nichols, this fails to prove that he was replaced by a *non-disabled* employee of Seariver. Nichols sustained an ankle injury on the job, and can only work subject to medical restrictions. Richards has not shown that Nichols was non-disabled; in fact, he claims Nichols, like himself, was "disabled" under the ADA and that they were similarly situated for the purposes of a Title VII claim. *See* part TV, *infra*. Richards has not offered evidence indicating he was replaced by a non-disabled worker, or that Seariver interviewed and hired a non-disabled individual to replace him.

Seariver argues that it did not hire a new employee to replace Richards as an Able Seaman. Seariver states that in March 1996, when Richards was terminated, it

had a pool of approximately 100 to 120 Able Seamen and 20 to 30 Maintenance Seamen who were licensed to sail as Able Seamen and could step up to the position as needed. These individuals were not permanently assigned to a specific vessel but were rotated among the vessels as needed... when Mr. Richards left the company, an individual from this pool... was rotated to perform his job duties.

(Defendant's Memo, Instrument No. 25, at 15). Otherwise, Richards has not provided any specific, factual evidence to support his allegations and to refute Seariver's assertion that it did not replace him with a non-disabled employee. Therefore, Richards has failed to establish a prima facie case of discriminatory discharge due to disability under the ADA.

### B.

Under the second part of the *McDonnell Douglas* burden-shifting test, if the plaintiff can establish a prima facie case of employment discrimination, the burden then shifts to the defendant to provide legitimate, non-discriminatory reasons for the discharge. *McDonnell Douglas*, 93 S.Ct. at 1824. Even assuming that Richards established a prima facie case, Seariver has proffered several nondiscriminatory reasons for Richards' discharge. First, Seariver claims it terminated Richards' employment because "he could not perform the essential functions of his job as Able Seaman with or without reasonable accommodation." (Defendant's Memo, Instrument No. 25, at 15). Seariver argues that during the Jones Act trial, Richards and his experts testified that he was unable "to lift more than 25 pounds, climb ladders, turn valves, grasp rails to maintain balance in rough seas, pull mooring lines, and respond to emergency situations." (Defendant's Memo, Instrument No. 25, at 15). Seariver also asserts that these functions which Richards was unable to perform could not be delegated to other Able Seaman on the ship. (Defendant's

Memo, Instrument No. 25, at 16). Thus, Seariver argues, Richards' inability to perform these duties made him a danger to himself and others on the ship in times of emergency. (*Id.* at 15). Furthermore, Defendants argue that they could not accommodate Richards with a shoreside position because there were none available for him given his physical restrictions, his education and training, and his experience. (*Id.* at 16). Seariver has proffered legitimate non-discriminatory reasons for its discharge of Richards, and has met its burden.

### C.

Once the defendant has articulated legitimate non-discriminatory reasons for the discharge, the plaintiff's prima facie case drops away and the plaintiff must prove that the defendant's proffered reasons were pretextual. *St. Mary's*, 113 S.Ct. at 2747. On summary judgment the plaintiff must prove that the defendant intentionally discriminated against him. Richards cites only his previous arguments that Floyd failed to inquire into available shoreside positions for Richards, and that Gerosa's email evinced a desire to discharge Richards regardless of available positions or his abilities. (Plaintiff's Objection, Instrument No. 27, at 9). Even assuming that Richards could establish a prima facie case, Richards has not shown that Seariver's articulated reasons for terminating him were pretexts for unlawful discrimination. Where the moving party has met its Rule 56(c)burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' " *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (quoting FED. R. CIV. P. 56(e)) (emphasis in original); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Leonard*, 828 F.2d at 294.

Richards fails to present competent summary judgment evidence showing he was discharged because of his disability. Even if Richards could establish a prima facie case, Seariver met its burden of providing non-discriminatory reasons for its conduct. However, Richards is unable to prove that these were merely pretextual reasons, and that he was the victim of intentional discrimination by Seariver. Accordingly, even when viewed in the light most favorable to Richards, the evidence does not support any triable issues of fact, and defendant's motion for summary judgment is GRANTED as to the ADA claim.

### IV.

Richards alleges that Seariver refused to allow him to return to work, discharging him because of his race and national origin. In addition, Richards claims that Seariver nevertheless created a shoreside position for a more severely injured white colleague, Jay Nichols. (Plaintiff's Objections, Instrument No. 27, at 10). Title VII makes it unlawful for an employer to discriminate against an individual with respect to that person's compensation, terms, conditions, or privileges of employment, or to otherwise adversely affect the person's status as an employee, because of that person's race. 42 U.S.C. § 2000e–2(a). To proceed on a discharge claim under a disparate treatment theory, "a plaintiff may establish a *prima facie* case of disparate treatment [under Title VII either] by satisfying the *McDonnell Douglas* four-part test, thereby creating a rebuttable presumption of discriminatory treatment, or by presenting *actual evidence, direct* or circumstantial, of the employer's discriminatory motive." *Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir.1985) (emphasis added); *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir.1994) ("There are two methods of establishing a prima facie case of disparate treatment under Title VII: direct or indirect (inferential)[.]").

634

Richards claims that there is direct evidence of race discrimination at Seariver, in that a new employment position was created at Seariver for an injured white colleague, but not for Richards himself despite his request. (Plaintiff's Objection, Instrument No. 27, at 10). "Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact (i.e. unlawful discrimination) without any inferences or presumptions." *Nichols v. Loral Vought Systems Corp.*, 81 F.3d 38, 40–41 (5th Cir.1996) (quoting *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 958 (5th Cir.1993)); *see, e.g., Kendall v. Block*, 821 F.2d 1142 (5th Cir.1987) (calling an employee "nigger" may be direct evidence of discrimination); *Bibbs v. Block*, 778 F.2d 1318 (8th Cir.1985), *overruled on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (holding that selection committee member's characterization of plaintiff as a "black militant" and reference to another black employee as "nigger" was direct evidence of discrimination in failure to promote case). In *Brown v. East Mississippi Electric Power Ass'n*, 989 F.2d 858, 861 (5th Cir.1993), the Fifth Circuit held that a supervisor's open and "routine use of racial slurs constitutes direct evidence that racial animus was a motivating factor in the contested disciplinary decisions." The Court reasoned that the supervisor's "racism infected the disciplinary decisions" of which the plaintiff complained since the supervisor *directly participated* in those decisions. *Id.* Furthermore, the Eleventh Circuit in *EEOC v. Alton Packaging Corp.*, 901 F.2d 920 (11th Cir.1990), held that general racially discriminatory statements made by a *decision maker* constituted direct evidence of the decision maker's failure to promote black employees for discriminatory reasons.

Here, Richards has not provided competent summary judgment evidence to prove there was direct evidence of racial discrimination at Seariver. Simply the fact that Seariver created a position for Nichols and not Richards, although both were injured

on the job, is insufficient by itself to constitute direct evidence of discrimination under the *Nichols* and *Bodenheimer* standards. Richards has not alleged or provided evidence of the use of racial epithets or similar denigrating treatment by the employment decision makers at Seariver such that "racial animus was a motivating factor" in his termination. *See Brown,* 989 F.2d at 861. Therefore, the Court concludes that Richards has not presented a prima facie case of direct race discrimination.

Consequently, Richards must prove through circumstantial evidence that he was subject to disparate treatment under the *McDonnell Douglas* burden-shifting test. In order to establish a prima facie case of termination based on race and national origin under Title VII, Richards must show that: (1) he is a member of a protected group; (2) he applied for a position for which he was qualified; (3) he was rejected; and (4) after his rejection, Defendants promoted or continued to seek other candidates not in his protected class. *See Harvey,* 961 F.Supp. at 1025 (citations omitted).

In support of his prima facie case of discrimination, Richards states the following: he "is a member of a protected class (black male of West Indian descent)"; he "was terminated after Defendant refused to return him to employment [as a seaman]... [y]et, Defendant created a position for a white colleague, Jay Nichols," whose "injuries were more severe and more restrictive overall than Plaintiff's injuries." (Plaintiff's Objection, Instrument No. 27, at 9–10).

With respect to the fourth element, Richards claims that he and Nichols were similarly situated, in that both were employed by Seariver as Able Seamen, and both were injured on the job. (Plaintiff's Objection, Instrument No. 27, Exh. A, Richards Deposition, at 162). In the Fifth Circuit, "similarly situated" in Title VII cases requires that the circumstances of

the disparate treatment be "nearly identical." *Mayberry v. Vought Aircraft,* 55 F.3d 1086, 1090 (5th Cir.1995) (citing *Davin v. Delta Air Lines, Inc.,* 678 F.2d 567, 570–71 (5th Cir. Unit B 1982)). In *Davin,* a co-worker reported the plaintiff, an airline ticket agent, to their superior for overbooking a flight. 678 F.2d at 568. Davin threatened that she would get the co-worker fired for reporting the incident. *Id.* at 569. Delta discharged Davin for overbooking and for retaliating against her co-worker. *Id.* Davin then filed a sex discrimination suit, claiming Delta had not discharged a fellow male employee, Vaiden, for similar misconduct. *Id.* Vaiden had been charged with stealing liquor from Delta and showing favoritism to two ticket agents. However, after investigation, the charges against Vaiden were dismissed as a misunderstanding. *Id.* at 558. The court rejected Davin's Title VII claim, finding she had failed to show that she and Vaiden were "similarly situated." *Id.* at 570. The court held that the situations must have been "nearly identical" in order to prove sex discrimination, and that Vaiden's alleged misconduct had not "placed [the listener] in fear nor altered his behavior in any way. Davin, on the other hand, made a true threat against [her co-worker]. In addition, she had engendered fear in the employees at the ticket counter for at least seven years." *Id.* at 571.

█ Richards agreed that his elbow injury and Nichols' ankle injury were different. (Plaintiff's Objection, Instrument No. 27, Exh. B, Deposition of Christopher Richards, at 162). Moreover, Richards' restrictions and Nichols' restrictions were not the same either. Richards, in his letter to Floyd, described himself as being permanently restricted to lifting no more than 25 pounds with his right arm, and to avoid overuse or repetitive action with his right arm. (Defendant's Memo, Instrument No. 25, Affidavit of Ronald Floyd, Exh. 2, at 1). Richards describes Nichols' restrictions as "not to stand or walk continuously for more than 1½ hours without a 20–minute break... not to kneel or squat when carrying out his duties... able to lift up to 30 pounds on an intermittent basis, i.e., not more than ten times per hour. Mr. Nichols is not to lift more than 30 pounds...." (Plaintiff's Objection, Instrument No. 27, at 3). Richards himself states that Nichols' restrictions are more severe than his own and concern a different body part. (Plaintiff's Objections, Instrument No. 27, at 4). They are differently situated as to their work abilities. Therefore, they cannot be "similarly situated" or "nearly identical" for the purposes of Richards' Title VII claim.

█ Even assuming, arguendo, that Richards establishes a prima facie case of race and national origin discrimination, Seariver has proffered several non-discriminatory reasons for Richards' discharge and the creation of Nichols' position. First, Seariver argues that it could not place Richards in any of the positions he requested. Richards, in his letter to Floyd, requested that he be returned to work as a chief mate, second mate, third mate, or captain in the foreign flag fleet of Seariver, maintenance seaman, or "any other job that [Seariver] could make reasonable accommodations to fit [his] disability." (Defendant's Memo, Instrument No. 25, Affidavit of Ronald Floyd, Exh. 2, at 2). Seariver points to Richards' own testimony in the Jones Act suit, where he claimed his elbow injury prevented him from engaging in climbing ladders, lifting cargo hoses, turning valves, opening emergency hatches, off loading life boats, etc. (Defendant's Memo, Instrument No. 25, Exh. 4, at 15–35, 39–40). Thus Seariver argues that Richards has admitted he could not perform these essential tasks on a vessel. (Defendant's Memo, Instrument No. 25, at 7–8). Furthermore, it argues that the court found Richards would be a danger to himself and others in times of emergency if he was placed upon a ship. (*Id.;* Defendant's Memo, Instrument No. 25, Exh. 2, Findings of Fact and Conclusions of Law, at 4 ¶ 12).

Next, in regards to the foreign flag fleet position, Seariver claims it could not accommodate Richards' request because it does not operate any foreign flag vessels or "own any companies, subsidiaries, or entities that operate foreign flag vessels." (Defendant's Reply, Instrument No. 31, at 7). Moreover, Seariver claims it "did not have a regular practice of, or even a system designed for, transferring employees to foreign flag vessels." (Defendant's Memo, Instrument No. 25, at 5). With regards to a captain position upon a domestic ship, Seariver argues that Richards was not qualified because he did not have U.S. citizenship nor a mate license as required by law. (Defendant's Memo, Instrument No. 25, at 5). Richards claims he became a citizen in August 1995, but he has not provided evidence that he informed Seariver of his change in citizenship. Moreover, the court in the Jones Act suit found that "Richards is unemployable as a Master or Mate, either in the foreign flag or American flag maritime fleet of vessels." (Plaintiff's Objection, Instrument No. 27, Exh. A, at 5).

Seariver then claims there were no shoreside positions for Richards "that he was qualified to perform, given his medical restrictions, education, training, and experience." (Defendant's Memo, Instrument No. 25, at 16). Richards claims that Floyd, his immediate supervisor upon the vessel, never made any effort to inquire into shoreside positions by his own admission in his deposition. (Plaintiff's Objection, Instrument No. 27, at 3). What Richards fails to add, however, that Floyd went on to explain that he was in charge of the positions upon vessels only, and that he was not in charge of shoreside employment positions. (Plaintiff's Objection, Instrument No. 27, Exh. E, Deposition of Ronald Floyd, at 175–76).

With regard to Nichols, Seariver claims it created the shoreside position of vessel agent because the company wished to reduce its damages. (Defendant's Memo, Instrument No. 25, at 18). In 1994, Nichols brought a Jones Act suit against Seariver for causing his ankle injury and sought to recover damages for future loss of wages. In the suit Seariver conceded liability for the injury but contested damages. The court found that Nichols could only receive minimum wage after his injury. (Defendants' Memo, Instrument No. 25, at 19). During mediation negotiations, Seariver suggested "converting an agent position being held by an outside contractor into an employee position to be held by Nichols. The purpose ... was to increase his future earning capacity, which in turn would reduce his recovery of future loss of wages and limit Seariver's exposure to damages." (Defendant's Memo, Instrument No. 25, at 19). In contrast, Seariver argues that it did not concede liability in Richards' Jones Act suit, and instead went to trial. Richards stipulated at trial, and the court found, that he could return to work and earn $12.00 per hour. (Defendant's Memo, Instrument No. 25, Exh. 2, at 6 ¶ 17). Subsequently, pursuant to a high-low settlement agreement, Seariver paid Richards $300,000 in damages. Therefore, Seariver argues, it had no reason to try to limit its damages in Richards' case, or create a position for him.

Therefore, even in the light most favorable to Richards, the Court finds that Seariver's motion for summary judgment as to Richards' Title VII discriminatory discharge and disparate treatment claim is **GRANTED.**

## V.

Next, Richards contends that Seariver retaliated against him for filing a Jones Act suit, an EEOC claim, and for testifying unsatisfactorily in his deposition taken for the suit by Seariver against IMS and Dr. Smith.

 The *McDonnell Douglas* burden-shifting approach also applies in analyzing retaliation claims brought under Title VII and the ADA. *Long v. Eastfield College,* 88 F.3d 300, 304 (5th Cir.1996)

(Title VII); *Sherrod v. American Airlines,* 132 F.3d 1112 (5th Cir.1998) (ADA). To establish a prima facie case of retaliation under Title VII and the ADA, a plaintiff must show: (1) that he engaged in a statutorily-protected activity; (2) that he experienced an adverse employment action following the protected activity; and (3) that a causal link exists between protected activity and the adverse employment action. *Nowlin,* 33 F.3d at 507; *Hamilton v. Rodgers,* 791 F.2d 439, 441–2 (5th Cir. 1986) (Title VII); *Sherrod,* 132 F.3d at 1121 (applying *McDonnell Douglas* burden-shifting framework in ADA case). In addition, the plaintiff must demonstrate that the retaliation was the "but for" cause of the adverse employment action. *McDaniel v. Temple Indep. School Dist.,* 770 F.2d 1340, 1346 (5th Cir.1985). Whether or not there were other reasons for the employer's action, the employee will prevail only by proving that "but for" the protected activity he would not have been subjected to the adverse employment action for which he seeks relief. *Jack v. Texaco Research Ctr.,* 743 F.2d 1129, 1131 (5th Cir.1984).

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. *McMillan v. Rust College, Inc.,* 710 F.2d 1112, 1116 (5th Cir.1983). "If the defendant introduces evidence which, if true, would permit the conclusion that the adverse employment action was nondiscriminatory, the focus shifts to the ultimate question of whether the defendant unlawfully retaliated against the plaintiff," that is, whether the conduct protected by Title VII and the ADA was a "but for" cause of the adverse employment action. *Long,* 88 F.3d at 304 n. 14.

Richards satisfies the first element of the prima facie case. Richards filed his Jones Act suit on October 25, 1993, alleging Seariver was responsible for his elbow injury. Second, in retaliation for filing the Jones Act suit and for testifying against him, Richards claims Seariver discharged him. (Plaintiff's Objection, Instrument No. 27, at 10). "To constitute a cognizable 'adverse employment action' an action must be an ultimate employment decision." *Skinner v. Brown,* 951 F.Supp. 1307, 1315 n. 9 (citing *Dollis v. Rubin,* 77 F.3d 777, 781 (5th Cir.1995)). " 'Ultimate employment decisions' include acts 'such as hiring, granting leave, discharging, promoting, and compensating.' " *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (quoting *Dollis,* 77 F.3d at 781–82 (noting that Title VII was not designed to "address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions")). Here, Richards was discharged by Seariver on March 31, 1996. As the discharge constitutes an "ultimate employment decision," Richards has established the second element of his prima facie case for retaliation.

Under the third element of the prima facie case, Richards must establish that "but for" the filing of the Jones Act lawsuit, his EEOC claim, and his deposition testimony in the IMS suit, Seariver would not have terminated his employment. When an adverse employment decision immediately follows an employee's participation in certain protected activity, it is fair to infer that the adverse action constitutes unlawful reprisal against that conduct. *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1310 (2d Cir.1995); *see Shirley v. Chrysler First, Inc.,* 970 F.2d 39, 44 (5th Cir.1992) ("the timing of the adverse employment action can be a significant, although not necessarily determinative, factor"). Richards filed his EEOC and TCHRA claims on June 2, 1995, and this action on November 14, 1996. Richards was terminated by Seariver on March 31, 1996, more than one year after he filed his Jones Act suit, less than a year from the EEOC and TCHRA filing, and before he filed this suit. However, Richards claims that Seariver had decided to terminate him prior to the end of his leave, and without

considering any other available positions, with or without accommodation. (Plaintiff's Objection, Instrument No. 27, at 10). Richards references an email from Gerosa, benefits specialist at Exxon, to Thompson at Seariver, where she noted on October 7, 1994, that Seariver "want[ed] to keep [Richards] on the payroll until his pending legal case is resolved... and then terminate his employment." (Plaintiff's Objection, Instrument No. 27, Exh. C, Deposition of Joan Gerosa, Exh. 2). Richards also claims that he was retaliated against for testifying adversely to Seariver in Seariver's case against IMS and Dr. Smith. He refers to Quazzo's remark that he would never work at Seariver again. Quazzo denied making this comment. Richards was terminated one month later, on March 31, 1996.

Here, Richards appears to be making two contradictory claims. He argues that the email from Gerosa to Thompson proves that Seariver planned to terminate Richards in October 1994, without considering his abilities or accommodations. Yet he also claims that Seariver terminated him in retaliation for his deposition in March 1996, one and one-half years later. Nevertheless, because Quazzo denies making the remark, there exists a genuine issue of fact. Since Richards has established a genuine issue of material fact with regard to this last element and has met his burden of establishing, he has established a prima facie case.

 Granting that Richards satisfies his burden, Seariver proffers legitimate non-discriminatory reasons for his termination, as discussed previously. Seariver maintains that Gerosa advised, per Exxon policy, that Richards was to be terminated following the resolution of the Jones Act suit. Gerosa testified that "Exxon's policy regarding leaves of absence ... says if you have under five years of service you can be granted a three-month leave of absence with one three-month extension, And then, if you're unable to return to work after that time, there is nothing further that we

can do." (Plaintiff's Objection, Instrument No. 27, Exh. C, Deposition of Joan Gerosa, at 10). Furthermore, Gerosa testified that "if somebody is unable to return to work, if they've exhausted their leaves of absence and they're unable to return to work, then they're generally terminated." (*Id.* at 15). Thus, instead of evincing a desire to terminate Richards due to his disability, the emails demonstrate at most a plan to discharge Richards because he had exhausted his two three-month leaves of absence and was to be terminated as per Exxon policy.

In addition, Seariver argues that even if Quazzo did make the alleged statement to Richards' attorney at the deposition, Quazzo had no authority to make employment decisions for Seariver and his point of view carried no weight. Quazzo "had no authority to hire, fire, discipline, or recommend an adverse employment action." (Defendant's Memo, Instrument No. 25, at 22). Seariver claims Quazzo did not recommend or discuss the occurrence with "anyone involved in making the decision to terminate Richards... Cahill and Floyd did not even know that Richards had been deposed." (Defendant's Memo, Instrument No. 25, at 22). Richards has not shown that Quazzo's comment affected the decision of the Seariver Human Resources department committee when it made its evaluation of Richards on March 13, 1996.

Even if the Court rejected Seariver's articulated reasons, it would not compel a finding of retaliation because it is not the defendant's burden to prove it had a legitimate non-retaliatory reason for terminating Richards. *See St. Mary's,* 113 S.Ct. at 2747 (noting that the burden-shifting approach does not relieve plaintiff of her ultimate burden of proving intentional discrimination). Richards has the burden of proving that Seariver's employment action was motivated by the desire to retaliate. *See id.* at 2747–54. Even if the Court were to ignore Seariver's proffered reasons, there would still be no evidence that Richards was terminated because he filed the Jones Act suit or because of his deposi-

tion testimony. Although Richards can support a prima facie case, he fails to meet his ultimate burden of persuading the Court that he has been the victim of intentional retaliation. *See id.* at 2747–48; *Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 957 (5th Cir.1993). Therefore, Seariver's motion as to Richards' retaliation claims is GRANTED.

## VI.

In addition to his federal claims, Richards also pleads unlawful employment discrimination and retaliation under Chapter 21 of the Texas Labor Code, specifically under the Texas Commission on Human Rights Act ("TCHRA"). The TCHRA states that it is an unlawful employment practice for an employer to discriminate against an employee because of his race or age. TEX. LAB. CODE ANN. § 21.051 (West 1998). The act also provides that "[a]n employer ... commits an unlawful employment practice" if it retaliates against an employee for opposing a discriminatory practice, for making or filing a charge or complaint, or for participating in an investigation or proceeding. *Id.* at § 21.055.

"An employee claiming a violation of the unlawful practices provisions of the Texas Labor Code must exhaust his ... administrative remedies before bringing a civil action for such violation." *O'Bryant v. City of Midland,* 949 S.W.2d 406, 417 (Tex. App Ct.1997, rev. granted) (citing *Schroeder v. Texas Iron Works, Inc.,* 813 S.W.2d 483, 485–88 (Tex.1991)). In order to avail himself of the administrative remedies, a plaintiff should file a charge of employment discrimination with the EEOC or the Texas Commission on Human Rights within 180 days of the alleged offense. *See* TEX. LAB. CODE ANN. §§ 21.201, 21.202 (West 1998); *Pope v. MCI Telecommunications Corp.,* 937 F.2d 258, 263 (5th Cir. 1991); *DeMoranville v. Specialty Retailers,* 909 S.W.2d 90, 92 (Tex.App.Ct.1995, rehearing overruled). "[U]ntimely complaints shall be dismissed by the commission." *Id.* Thus, "[t]he filing of a complaint ... is a mandatory, jurisdictional prerequisite to the assertion of claims under the relevant provisions of the Labor Code." *O'Bryant,* 949 S.W.2d at 417. "Faithful to our Erie duty," this Court must follow Texas court decisions that the time limits under the TCHRA are "mandatory, and that an action is not maintainable where the limitations period is not followed." *Pope,* 937 F.2d at 264. Here, Richards filed a discrimination charge with the EEOC and the Texas Human Rights Commission on June 2, 1995, and an amended charge on May 8, 1996.

However, Richards' TCHRA claim cannot stand. Because a majority of courts interpreting the TCHRA have relied almost exclusively on federal authorities, this Court can interpret the TCHRA coextensively with Title VII and the ADA. *See Cervantez v. Bexar County Civil Service Comm'n,* 99 F.3d 730, 734 n. 6 (5th Cir. 1996) (noting that Title VII claims under the TCHRA are to be interpreted consistently with federal precedent); *Patton v. United Parcel Service, Inc.,* 910 F.Supp. 1250, 1270 (S.D.Tex.1995); *Morton v. GTE N. Inc.,* 922 F.Supp. 1169, 1183 (N.D.Tex. 1996) (interpreting the TCHRA claim coextensively with the ADA); *Schroeder,* 813 S.W.2d at 485 (TCHRA claims analogous to Title VII claims). One of the purposes of the TCHRA is the correlation of state law and federal law in the area of employment discrimination. *Schroeder,* 813 S.W.2d at 485. Having already determined that summary judgment is appropriate with respect to Richards' ADA claim, his race and national origin discrimination claim, and retaliation claims under Title VII and the ADA, the Court concludes that it is also appropriate as to Richards' parallel claims under the TCHRA. *See Patton,* 910 F.Supp. at 1270.

Since the TCHRA is interpreted consistently with Title VII and the ADA, and the Court has already granted summary judgment as to the ADA and Title VII claims, the Court GRANTS summary judgment as

to Richards' discrimination and retaliation claims under the TCHRA.

## VII.

Richards also argues that Seariver caused him severe emotional distress. Richards has failed to plead with specificity the facts that support his claim of severe emotional distress. Instead, Richards' response to the motion for summary judgment simply claims, "for the same reasons as stated, Plaintiff's intentional infliction of emotional distress claim is viable." (Plaintiff's Objection, Instrument No. 27, at 12). Richards has not referred this Court to the specific, pertinent portions of the depositions and affidavits he has filed. The party opposing the motion for summary judgment bears the burden of coming forward with *"specific facts* showing there is a genuine issue for trial." FED. R. CIV. P. 56(c) (emphasis added). This "[Court is not obligated to scour the record looking for factual disputes; the judge [is] not required to sift through every transcript [Richards] filed to find testimony to back up his case." *Uhl v. Zalk Josephs Fabricators, Inc.,* 121 F.3d 1133, 1135 (7th Cir.1997). Seariver, however, managed·to glean what allegedly caused Richards' severe emotional distress, and for the purposes of this discussion the Court will accept the proffered allegations. Richards claims that Floyd did not return his phone calls; that when he requested to return to work, Townsend would not give him a specific answer; Seariver refused to accommodate him; he was not offered a shoreside position; and that a white employee, Nichols, was treated more favorably than Richards. (Defendants' Memo, Instrument No. 25, at 24–25).

To prevail on the claim of intentional infliction of emotional distress, the plaintiff must prove that (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendants cause the plaintiff emotional distress; and (4) the resulting emotional distress was severe.

*Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995); *Twyman v. Twyman,* 855 S.W.2d 619, 621–22 (Tex. 1993). "Liability [for outrageous conduct] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious.... Generally, the case is one in which a recitation of the facts to an average member of the community would lead him to exclaim, 'Outrageous.'" *Dean v. Ford Motor Credit Co.,* 885 F.2d 300, 306 (5th Cir.1989). Liability, however, does not extend to "mere insults, indignities, threats, annoyances, or petty oppression. Even conduct which may be illegal in an employment context may not be the sort of conduct constituting extreme and outrageous conduct." *Id.*

Whether the conduct alleged by Plaintiff may reasonably be regarded as extreme and outrageous is a question of law to be addressed by the Court. *Wornick Co. v. Casas,* 856 S.W.2d 732, 734 (Tex.1993). However, a claim for intentional infliction of emotional distress will not lie for mere employment disputes. *Johnson v. Merrell Dow Pharmaceuticals, Inc.,* 965 F.2d 31, 33 (5th Cir.1992); *Wornick,* 856 S.W.2d at 734 (wrongful discharge does not support claim for intentional infliction of emotional distress).

The Court finds that the conduct at issue in this case, the failure to return phone calls, the lack of response to the request to return to work, the failure to accommodate, and the different treatment of Nichols, does not rise to the level of outrageousness necessary to support a finding of liability under the standard announced in *Randall's Food Markets.* To be actionable, the Seariver employees' actions must surpass all bounds of decency becoming "utterly intolerable in a civilized community." *Ugalde v. W.A. McKenzie Asphalt Co.,* 990 F.2d 239, 243 (5th Cir. 1993). Such is not the case here. *See Wornick Co. v. Casas,* 856 S.W.2d 732, 734

(Tex.1993) ("[T]he fact of discharge itself as a matter of law cannot constitute outrageous behavior"); *Corum v. Farm Credit Services,* 628 F.Supp. 707, 718–19 (D.Minn.1986) (holding that defendant's conduct in firing the plaintiff after years of loyal service and requiring him to clean out his desk and leave immediately was not outrageous); *Toth v. Square D Co.,* 712 F.Supp. 1231, 1238 (D.S.C.1989) (termination of long-term employees without advance notice and company's removal of them from the premises in the presence of their coworkers was not sufficiently outrageous to support liability).

Richards has not adequately established that he suffered emotional distress. Although he cited actions taken by Seariver employees that he claims caused him distress, he has not pointed out evidence detailing *how* the lack of response caused him emotional distress. Moreover, Richards has not established that the emotional distress he suffered was severe. Severe emotional distress does not include mere worry, anxiety, vexation, embarrassment or anger. *Regan v. Lee,* 879 S.W.2d 133, 136 (Tex.App.—Houston [14th Dist.] 1994, no writ). A plaintiff may recover under this tort only if his emotional distress is so severe that "no reasonable [person] could be expected to endure it." *K.B. v. N.B.,* 811 S.W.2d 634, 640 (Tex.App.San Antonio 1991, writ denied), *cert. denied,* 504 U.S. 918, 112 S.Ct. 1963, 118 L.Ed.2d 564 (1992); *see also Benavides v. Moore,* 848 S.W.2d 190, 195–96 (Tex.App.—Corpus Christi 1992, writ denied). Richards has clearly failed to meet this burden. He has produced no evidence to indicate that he suffered any emotional harm or that the harm he suffered reached the level of severity required in *K.B.* or *Benavides.*

The Court, therefore, concludes as a matter of law that the harm Richards allegedly suffered is not severe enough to allow him to recover under a claim for intentional infliction of emotional distress. Seariver's motion for summary judgment is hereby **GRANTED** with respect to this cause of action.

## VIII.

Accordingly, Defendant's Motion for Summary Judgment is **GRANTED.**

The Clerk shall enter this Order and provide a copy to all parties.